157 A.2d 582 (1960)
NEW CASTLE BOAT CO., Inc., a corporation of the State of Delaware, Plaintiff,
v.
John GAMBACORTA, Edith Gambacorta, Henry F. Gambacorta, Theresa A. Gambacorta, Walter Young and Teresa R. Young, Defendants.
Court of Chancery of Delaware, New Castle.
January 22, 1960.
George L. Sands and Carl M. Mortenson, Wilmington, for plaintiff.
Joseph A. L. Errigo and Frederick Knecht, Jr., Wilmington, for defendants.
MARVEL, Vice Chancellor.
In the late spring of 1958, John R. Dougherty, Thomas M. Leef, Jr., and Mr. and Mrs. John Weaver[1] entered into negotiations with John Gambacorta for the purpose of obtaining a long-term leasehold of approximately two and a half acres of river front to be carved out of a larger property owned by him near New Castle. After October 8, 1958, negotiations were continued with the defendants and Mr. *583 and Mrs. J. Harry Truitt, all of whom on that date became tenants in common of the Gambacorta lands.
Plaintiff's object in seeking a lease of river property was, as its name indicates, to enter into the business of operating a yacht basin including shore enterprises connected with such a business. While Mr. Gambacorta was obviously desirous of leasing the property in question, working out an agreement proved to be difficult principally because of differences over plaintiff's proposed marine activities and the like, plaintiff insisting that its rights in this field be exclusive. Another factor which was conducive to delay was that at the beginning of negotiations plaintiff did not have independent counsel. However, pending the drawing up of a mutually agreeable formal lease, plaintiff with the landowner's consent moved into the area proposed to be leased and began making installations required for its contemplated business in the obvious expectation that a formal long term agreement would shortly be entered into. It was not until early in November, however, a month after title to the property in question had been conveyed to the tenants in common, that an approved form of lease was finally agreed on, and not until December 5, 1958 that the lease was formally "accepted" by the parties' attorneys and recorded in the office of the Recorder of Deeds.
Plaintiff takes the position that the matter of so-called minimum rent payments, which by the terms of the lease are due on or before July 1 of each year, commencing with July 1, 1958, was not a critical problem during the long drawn-out negotiations, alleging that it had been agreed between the parties at various times up to and including December 5, 1958 that when it came to the formal execution and acceptance of the lease it would then be decided when, where and to whom the first annual rental payment in the amount of $300 would be made. Plaintiff complains that notwithstanding such understanding defendants on December 24, 1958 arbitrarily took the position through their attorney that the lease was at an end because of plaintiff's technical default in not paying rent either in advance or within a period of thirty days from its inception as provided for in the lease.
The lease is dated November 20, 1958. It provides for a term of five years beginning July 1, 1958 at progressive fixed annual minimum rentals plus additional rentals based on a percentage of gross receipts and explicitly grants plaintiff exclusive marine rights of a wide variety in the area in question. These percentages were fixed so as to provide for additional rental[2] in amounts which might be substantial in the event plaintiff's business should prosper. Significantly, plaintiff was granted options to renew the lease for two additional terms of five years each with the possibility of later indefinite two year extensions of the lease provided it was not thereafter terminated by the landlords. Furthermore, plaintiff was given the right to purchase the leased premises in the event the owners should receive on outside, bona fide offer, such purchase to be made by plaintiff's tender of an amount equal to such offer. Plaintiff was also given the right to construct a road to the leased premises through other lands of the landlords', who agreed not to permit any business to be operated on their other lands adjacent to the leased premises which would directly or indirectly compete with plaintiff's. Finally, plaintiff was given a "first right" to rent additional lands owned by the lessors adjacent to and north of the leased premises.
Plaintiff, having now been in possession of the premises in question since July 1958 and having been charged on December 24, 1958 with failure to pay rent and ordered to vacate, has since such alleged default *584 regularly tendered amounts due under the lease. Plaintiff prays that this Court require defendants to perform their obligations under the lease, and asks alternatively that in the event no valid lease should be found to exist that defendants be required to enter into a lease in the form sued upon.
Defendants' answer avers that "* * * The allegation that the lease was terminated as of December 24, 1958, because the sum of Three Hundred Dollars ($300.00) which under the terms of the lease was payable in advance on or before July 1, 1958, had not been paid by plaintiff is admitted * *." It also charges fraudulent concealment as to the parties to the lease and claims that plaintiff by reason of unclean hands is estopped from prosecuting this action.
This is the opinion of the Court after trial at which plaintiff sought to establish its case on the basic proposition that inasmuch as the lease was not formally "accepted" until December 5, 1958, plaintiff's tender of rent on December 26, 1958 following the landlords' claim of a default came within the so-called thirty day grace period for paying rent. Much of the testimony introduced at trial pertains to the establishment of an effective date for the lease, which is dated November 20, 1958, but, in my opinion, it is unnecessary to delve into the confusing facts concerning the execution and delivery of the lease, or to be concerned about the controversial testimony of one of plaintiff's attorneys, who sought to fix December 5, 1958 as its so-called "acceptance" date (although I am satisfied that all the landowners had executed the final form of lease on or before November 20) because, in my opinion, this is not a case in which an allegedly late tender of a rental payment should work a forfeiture. Compare Old Time Petroleum Co. v. Turcol, 18 Del.Ch. 121, 156 A. 501, 505. See 19 Am.Jur., Equity, § 94 and Annotation in 31 A.L.R.2d 321 et seq. Not only did plaintiff enter into possession of the premises in the summer of 1958 and make a number of installations including a road, but the interminable delays in the formal execution of a lease that by its terms runs from July 1, 1958, and the absence of any demand for rent until December 24, 1958, necessarily lead to the conclusion that tender and receipt of a formal rent payment was not an important factor in the parties' minds either before or immediately following the drawing up of the formal lease and that defendants' demand was an afterthought. In fact, the evidence discloses a situation in which the language of Chancellor Josiah O. Wolcott in Old Time Petroleum Co. v. Turcol, supra is most pertinent:
"From these circumstances above detailed, I am convinced that the forfeiture was not in the interest of vindicating the landlord's right to receive rent, which presumably the forfeiture clause was designed to safeguard, but solely in the interest of destroying the tenant's right to enjoy the option privilege to purchase which the tenant had previously advised the landlord he proposed to exercise.
"The case seems to me to be one in which, under its peculiar circumstances the defendant should not be permitted to avail himself of the advantages which a forfeiture would give him."
However, what equitable relief is plaintiff entitled to at this juncture? It is in possession, no eviction proceeding is pending, and a lease valid on its face is in existence. Furthermore, unlike the situation in Old Time Petroleum Co. v. Turcol, supra, plaintiff is not seeking the enforcement of a purchase option through a decree requiring defendants to execute a deed to the optioned property notwithstanding plaintiff's default in rent. In short, plaintiff has its lease and merely requires equitable relief against an unreasonable forfeiture, relief to which I think it is entitled unless the defenses advanced by defendants negative such right.
Turning to the defenses, defendants, in addition to standing on the forfeiture *585 provision of the lease, charge fraudulent concealment as to the parties to the lease, and, while not proceeding by formal counterclaim for rescission, pray that the lease be rescinded because of fraud. The proof adduced at trial, however, fails to sustain such charge. No misrepresentations, innocent or otherwise, were made by plaintiff's officers or agents concerning plaintiff's proposed purchase from the Truitts of an undivided interest in the lessors' lands. The evidence rather discloses that the Truitts, having become interested in selling out their interest in the river property in question and having approached John Gambacorta with inconclusive results, reached an agreement with plaintiff and conveyed their interest after the lease was executed. Plaintiff, having bargained at length with the landowners in an arms' length business transaction, in my opinion, had no legal duty to disclose information concerning the Truitt proposal to defendants prior to execution of the lease by the then landowners, and there is no fatal inconsistency between the terms of the lease and the later acquisition of the Truitts' undivided interest by plaintiff. Significantly, defendants did not seek rescission after the Truitt deed was recorded on November 24, 1958, but rather stood on the lease and demanded forfeiture. I conclude that if defendants were in fact actionably[3] betrayed, it was by former co-owners of their property and their remedy lies against them and not against plaintiff whose officers and agents made no misrepresentations, but who, in a situation in which they had no duty to disclose to defendants that the Truitts were selling out, merely remained silent. Finally, because this is not a case of specific performance, notwithstanding plaintiff's theory to the contrary, the principles governing a court of equity in the granting or denying of specific performance are not in point. For the reasons stated in denying defendant's counterclaim for rescission I similarly find no merit in defendants' defense of unclean hands.
Under plaintiff's general prayer for equitable relief defendants will be enjoined from implementing their December 24, 1958 notice directing plaintiff to vacate provided plaintiff makes a tender of rent now due plus appropriate interest. Defendants' counterclaim for rescission of the lease, dated November 20, 1958, will be dismissed.
Order on notice.
NOTES
[1] These individuals shortly thereafter organized the plaintiff corporation.
[2] 2% of gross receipts up to $20,000; 1% of gross receipts from $20,000 to $50,000, and ½% of gross receipts above $50,000.
[3] However, according to Thompson on Real Property, Vol. 4 § 1835, a tenant in common normally has the right to divest himself of his entire interest in the common property without the consent of his former cotenants.