THE EMPLOYERS' LIABILITY ASSURANCE CORPORATION, LIMITED, a British corporation, Plaintiff, v. DAVID MADRIC and JAMES D. MADRIC, Defendants, and WESLEY C. HENDERSON, Intervening Defendant.

*(October* 2, 1961.)

STOREY, J., sitting.

*Clement C. Wood* (of the firm of Allmond and Wood) for the Plaintiff.

*Max S. Bell, Jr.* (of the firm of Richards, Layton and Finger) for the Defendants, David Madric and James D. Madric.

*William T. Lynam, III,* (of the Office of Ernest S. Wilson, Jr.) for the Intervening Defendant.

Superior Court for New Castle County, No. 368, Civil Action, 1959.

STOREY, J.:

This is an action for a declaratory judgment to determine duties and liabilities under the terms of an automobile liability insurance policy. The jury could have found the following facts.

David Madric is a somewhat untutored and unsophisticated man. He owned a Chevrolet automobile, for which he took out insurance against liability. The plaintiff, Employers' Liability Assurance Corporation, Limited, wrote the insurance policy, which was sold by plaintiff's agent, Walter Hawke. This policy contained an endorsement which greatly narrowed the insurer's liability; though the premium seems to have been the same as for a regular unrestricted policy. The endorsement stated that:

"It is agreed that such insurance as is afforded by the policy shall apply only while the automobile * * * is being operated by David Madric, and spouse."

It would appear from the record that at the time this policy was issued neither Mr. Hawke, nor anyone else, explained the policy or its restrictive endorsement to the unsophisticated insured. This was April 1958.

On 3 July 1958, Mr. Madric traded his Chevrolet for a Buick. On 5 July, 1958, his son, James, reached his sixteenth birthday and wished to get a license so that he could drive his father's car. These events provided two incentives for Mr. Madric to once again contact plaintiff's agent, Mr. Hawke. First, to transfer the policy to his new car, and, second, to check upon coverage for his son, for he did not feel able to sign for the boy's license until he was assured that he would be covered. Relative to this second point, Mr. Hawke was uncertain whether his company wrote insurance for minors. At a later date, he reported to Mr. Madric that such insurance was available and that it would cost around $106.

At this point, the facts become vital, and the jury's determination is significant, for it is here that defendants contend that Mr. Hawke interpreted the policy and offered advice upon which Mr. Madric based his decision not to purchase any insurance beyond that which he already had. The record is clear that Mr. Madric wanted his son to be covered. This was his manifest intent as expressed to Mr. Hawke. His dealings with Mr. Hawke concerned how this might best be done. One way was obvious, purchase the $106 policy for his son. However, Mr. Madric testified that Mr. Hawke advanced an analysis which turned upon whether or not the boy would be the principal operator of the car. The inference was that if the boy were to be the principal operator he would have to have the special $106 policy, whereas, were he not to be the principal operator, then the present policy would be adequate. Since his boy was not to be the principal driver, and since he was somewhat pressed for funds, and since he understood that with his son not being the principal driver, his present policy was adequate, Mr. Madric concluded that it would not make sense to buy the special, apparently unnecessary, policy. Feeling assured, he signed for the boy's license. Thus, under Delaware law, Mr. Madric assumed joint and severable responsibility for any accident his son might have up until the boy's eighteenth birthday.

On January 12, 1959, the son, James D. Madric, while driving his father's car, had an accident, wherein Wesley C. Henderson was injured. Mr. Henderson sued the Madrics. Plaintiff insurance company made a disclaimer of coverage and brought this action against the Madrics for declaratory judgment. Mr. Henderson has been permitted to intervene as a party defendant. The case was tried by a jury, which made three specific findings of fact:

(1) The insurer's agent, Walter Hawke, represented to David Madric that if his son, James, was not to be the princi-

pal operator of the Madric car, then the son's operation of the car would be covered by the policy then in force;

(2) David Madric believed said representation to be true; and

(3) David Madric acted in reliance upon said representation.

In conformity with these findings, judgment was awarded to defendants.

At trial, plaintiff made appropriate motions for a directed verdict, which were duly denied. At present, we have before us a motion by plaintiff to have judgment entered in accordance with its motion for a directed verdict, or in the alternative, for a new trial.

█  Plaintiff has offered several arguments in support of its alternative motions. First of all, it argues that the Court should have directed a verdict for plaintiff on the theory "that no testimony was introduced at the trial upon which a belief could be based that Hawke told Madric or implied that Madric's son, James, would be covered by the policy if he was not the principal driver." To support this theory, plaintiff devotes six pages of its first brief to quoting extracts from the trial transcript which purport to be " all the testimony in the record concerning the defendant's contention" of misrepresentation. The remarkable thing about plaintiff's quotations is that they defeat the very point they were alleged to support. For example, plaintiff's counsel cross-examined Mr. Hawke as follows:

"Q.  Would you tell us just exactly how you used them. What did you say to Mr. Madric involving the words 'principal driver' or 'principal operator'?   A.   It was his question as to why the youngsters under age had cars registered in their names and could obtain the insurance?

"Q. And what did you say to him? A. I told him, in that event, that an under-age driver, *as the principal operator* of the car, that the premium would be even higher, and named a figure of $106.

"Q. You said that, *if the under-age driver were principal operator* of the car, the premium for that *type of coverage* would immediately jump to over $106? A. That is right." (Emphasis added.)

Thus, we see that Mr. Hawke admitted a discussion with Mr. Madric about the boy being the principal operator of the car. I now quote representative selections from Mr. Madric's testimony about this same conversation.

Direct examination of Mr. Madric.

"Q. What was the next time that there was any conversation with respect to this insurance policy? A. That was along the first of July. My boy become 16 on the 5th of July, and around the 3rd I traded cars; and I went to Mr. Hawke and I asked him about getting me more insurance for my boy, because he wanted to get his license and I couldn't sign his license until I got insurance.

\* \* \* \* \* \*

"So, he told me, he said, 'Well, we can get it, but is you going to make the boy the principal driver of the car?', and I said, 'No, because we ain't got but one car in the family, and we ain't hardly able to keep that.' He told me what it would cost, and then he explained to me about the insurance.

"He said, 'If you definitely want it, I can get it for you, but, if anything would happen, which we hope it won't, you will have the same responsibility[1] with the insurance you got as you would have if you were spending $106.'

---

[1]Madric's use of the word "responsibility" throughout his testimony is inapposite and reflects his lack of sophistication. It seems clear that he meant "coverage".

"I said, 'Well, I don't have $106, and I will have to borrow it', and I said 'If I had the same responsibility, I didn't see where it made any sense to borrow $106'; and then he said, well, I wasn't covered.

"Q. When did he say this? A. When I took the blank down for him to fill out.

"Q. About the accident? A. That is right."
At a later time, Madric made further explanation when answering a question by the Court:

"I said, 'Well, I want it.' So—but you got to make the boy the principal driver of the car. I said, 'No, we only got the one car for the family to use, and can hardly keep that.' * * * Then he told me wherein he could get the insurance but it wouldn't make sense to me to spend that kind of money on the insurance because I would have the same responsibility, the same responsibility with the insurance I had, either if I got the one for the hundred and six dollars. So I said, 'Well, if that's the case it don't make sense to me to spend no hundred and six dollars because I don't have the hundred and six dollars and I have to borrow it.' So then I took him at his word and I signed the boy's license. Then on February, I believe, when the accident occurred, then I went back with the accident report, then they told me I had no coverage."

Thus, on the strength of these quotations, as selected by plaintiff's counsel, I conclude that there was adequate testimony to support the jury's special findings, as above set forth, and that plaintiff's motion for a directed verdict, on the basis of a failure of proof, is clearly without merit.

I believe it also pertinent to note in this connection, that in viewing such testimony, as above set forth, relative to misrepresentation, belief and reliance, one must bear in mind the status of Mr. Hawke as a presumably qualified and knowl-

edgeable insurance agent and contrast it to Mr. Madric, who at trial gave every indication of being markedly unsophisticated and untutored.

This tends to serve as an introduction to another of plaintiff's arguments. It is contended that the Court committed double error in charging the jury on misrepresentation. First of all, it is argued that there was no testimony presented that would indicate the existence of any misrepresentation, hence, the charge should not have been given at all. This point is clearly without merit, and may be disposed of by the same analysis as was above employed to show a factual base for the jury's findings.

Secondly, it is argued that the law was erroneously stated when I charged that:

"A type of conduct which subjects one to liability for false statements consists of 1. false representation; 2 carelessly made; 3 which induces reliance thereon, and the reliance is justified and causes damage to the defendant."

Plaintiff maintains that the correct law is set forth in *Nye Odorless Incinerator Corporation v. Felton, (Super.* 1931) 5 *W. W. Harr.* 236, 162 *A.* 504. The *Nye* case concerned an action for common-law fraud and deceit. Plaintiff argues that this case is also an action of deceit and hence of fraud. But this is where plaintiff goes astray. The case at bar is not one of fraud or deceit. If it were, *Nye* would apply. Rather, we are here concerned with a case wherein a negligent or careless misrepresentation is advanced as the basis upon which to impose an estoppel. If such an estoppel were imposed, it would be because we hold plaintiff liable for its agent's negligent or careless language, which resulted in a misrepresentation. To be sure, Madric claims to have received misinformation. He was misled, or, if you would, fraudulent connotation aside, he was deceived. But we are not here concerned with misinfor-

mation fraudulently given with an *intent* to deceive to the prejudice of another. We come to the same end, but there is a difference. Here, the misinformation was the result of carelessness or negligence, not amounting to fraud. Plaintiff seems to argue that such a giving of misinformation is not actionable, for it is urged that "mere carelessness * * * is not enough."

In the case of *International Products Co. v. Erie R. Co.* (*Ct. App.* 1927) 244 *N. Y.* 331, 155 *N. E.* 662, 663, 56 *A. L. R.* 1377, bailor bailed good with bailee. Bailee carelessly misrepresented to bailor that the goods were stored in location A, whereas they actually were stored in location B. Acting on this misinformation, bailor bought insurance on his property covering storage at location A. Then there was a fire and the goods were destroyed. Bailor's policy was not good for location B, the actual situs, and hence he suffered a loss due to bailee's negligent misrepresentation. The Court expressly ruled out any question of fraud or deceit and declared the issue to be solely one of "liability for negligent language." In summarizing the law on this point, the Court said:

"Liability in such cases arises only where there is a duty, if one speaks at all, to give the correct information. And that involves many considerations. There must be knowledge, or its equivalent, that the information is desired for a serious purpose; that he to whom it is given intends to rely and act upon it; that, if false or erroneous, he will because of it be injured in person or property. Finally, the relationship of the parties, arising out of contract or otherwise, must be such that in morals and good conscience the one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care. * * * We do not touch the doctrine of *caveat emptor*. But in a proper case we hold that words negligently spoken may justify the recovery of the proximate damages caused by faith in their accuracy." *Supra* 155 *N. E.* at 664.

To the same effect, see 1 *Harper and James, The Law of Torts,* § 7.6, pp. 545-548; and the *Restatement of Torts,* § 552.

I do not believe it can be gainsaid that above principal can justly be applied to the case at bar. Here, there was a business relationship vis-à-vis a presumably knowledgeable insurance agent and a markedly uninformed insured. The insured, Madric, sought important information. His intent was serious and he was seeking advice as to how he should proceed. This all must have been apparent to Hawke who undertook to supply the information and advice. We have seen how a jury could find that Hawke carelessly or negligently supplied misinformation and how it could further be found that Madric believed the misrepresentations to be true and acted thereon. Having been given this false sense of security, Madric signed for his son's license. When the accident occurred, it then became apparent that the strict language of the policy precluded coverage much to Madric's detriment. If the strict language of the restrictive endorsement is enforced, Madric will be made to suffer.

Had Mr. Madric been more learned, had he not come back to Mr. Hawke for advice, then this case might have had an entirely different complexion. But it is manifest that Mr. Madric had a very limited comprehension about the terms of his policy. No one explained it to him when it was issued in April. If he read it himself, he probably gleaned very little of its import, for he reads "just a little"; he merely "sees words." Such policies are trying enough for a learned man to wade through, let alone one who is not too well informed.

I do not here presume to say that Mr. Hawke was *required* to advise Mr. Madric of the full meaning of the policy with a thorough explanation of all coverage provided. I merely say that once he did undertake to explain and advise, he then assumed the duty to do so carefully, correctly and

accurately. This duty was clearly assumed in the July discussions, and Mr. Hawke failed to live up to his obligation.

█ To be sure, there are certain presumptions in the law that people read what they sign and know what they read. However, in proper cases, these presumptions are overcome, and certainly in a case such as this, where one party gives evidence of non-comprehension and seeks advice in a business way from the agent of the other party, and said agent presumes to give such advice, then a new relationship arises and tends to supplant the mechanical strictures of the rather harsh presumptions. Thus, this case is firmly within the ambit of the rule in the *Restatement of Torts*, § 552, and the language above quoted from *International Products Co. v. Erie R. Co.*

The next question is whether said misrepresentations are sufficient to bind the plaintiff insurer, through its agent, on the theory of estoppel in this action *ex contractu*. Should the plaintiff be estopped to rely on the restrictive endorsement in the policy delimiting coverage to those terms when the car was "being operated by David Madric, and spouse"?

It should be firmly noted that I am founding my opinion herein upon the concept of estoppel. I do not believe the record shows an adequate base upon which to find a waiver, at least not an express waiver. I say this for I do not understand anyone to argue that Mr. Hawke had the restrictive endorsement in mind when he proffered his advice. It would seem that he simply failed to consider it.

█ In opposition to the application of an estoppel, plaintiff offers two primary objections. First of all, it is argued that the non-waiver provision of the policy precludes an estoppel. Said provision is entitled "Changes" and provides:

"Notice to any agent or knowledge posted by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop the company from asserting

any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy."

It is maintained that such policy restrictions upon an agent's authority are binding upon the insured, who is deemed to have notice of such restrictions, and hence is precluded from claiming a waiver or an estoppel of the insurer because of some such knowledge or proscribed conduct of the agent. Plaintiff seems to consider such non-waiver provisions as absolutely binding, hence it claims the Court erred in charging that a provision against waiver in a policy may itself be waived by an insurer or its agent.

In disposing of these contentions, I begin by observing that plaintiff seems to read too much into the non-waiver clause. In that portion of the clause up to the semicolon, we are faced with a situation where "Notice" is given to an agent or "knowledge" is "posted by" an agent or some other person. Certainly, the case at bar involves something more than mere "notice" to an agent; and though I am not exactly sure what is meant by "knowledge posted by" an agent, I am reasonably certain that we are beyond its delimitations also. Here, the agent acted affirmatively upon a request for information, and in so acting he misinformed. Now, I pass over the question of a one-sided waiver since I have already deemed it to be inapplicable. Nor do I believe that we are concerned with a "change" in any normal sense of the word. Mr. Madric was not seeking a change in terms, nor did Mr. Hawke presume to effect a change. The document remained as written. No one was aware of any "change" *per se*. Such a change, were one to have been attempted, would properly be brought to issue via the concept of waiver. But here we deal with estoppel. In estoppel, we would preclude the insurer from insisting upon the strict unchanged language of the policy for to enforce it would be unjust and inequitable. Insurer would profit by the tortious conduct of its agent to the detriment of an

innocent and misled insured. Thus by enforcing an estoppel here, we would admit the clause was not changed but still prevent it from being utilized by the insurer. Hence, we are not here concerned with a "change" as I understand that term to be used in the first part of the non-waiver clause. What I have just said also militates against the efficacy of the second part of the non-waiver clause, for in said second part we are only concerned with "waiver" and "change", and estoppel is not mentioned. But it must be noted that the *first* part of the clause *does* refer to estoppel, and so to dispel any residuary reservations that may still remain, I refer with favor to the language in 3 *Couch On Insurance* 2d, § 29:90, wherein it is said:

"By the most liberal and probably the majority view, the insured is permitted to rely upon the apparent authority of the insurer's agent, regardless of the presence in the policy of a limiting provision. That is, the existence in the policy of a provision *not known to the insured* does not affect his right to rely on the apparent authority of the agent. Under this rule if the insurer clothes its agent with an apparent authority greater than that permitted by the provisions of the policy, the agent may act within the scope of such apparent authority and the insurer is *estopped* from relying on the provisions of the policy. Accordingly, any agent with general or unlimited powers, or clothed with actual or apparent authority, may waive, either orally or in writing, or by his acts and conduct, *any* written or printed condition in the policy, notwithstanding such restrictions, even though the policy expressly declares that a waiver can only be made by specified other persons or agents, or that it may only be made in a certain manner or that it must be endorsed on the policy. *According to this view, a provision against waiver is one that may itself be waived.*" (Emphasis added.)

To the same effect is the language in 29 A, *Am. Jur.*, Insurance, § 1044. This text authority supports my charge, as

above noted, and leads me to conclude that if waivers and change can be effected in a case such as this, notwithstanding a non-waiver clause, then surely the concept of estoppel may also be brought to bear. It should be noted that the above-quoted analysis approaches the problem by imposing an estoppel to assert the non-waiver clause as a defense to an admittedly unauthorized waiver of terms or change of conditions. My analysis for the case at bar is somewhat different, for I have ruled out any waiver or change *per se*. I am here concerned with a double estoppel. The first estoppel precludes a reliance upon the non-waiver clause utilizing the analysis above quoted. This leaves open the possibility of imposing another estoppel to advance the restrictive endorsement as a defense. Though it might all come to the same end, I believe the variation of approach is worthy of note. In both cases, the estoppel to assert the non-waiver clause is in large part founded upon the fact that insured was unaware of its existence. I believe it to have been adequately demonstrated that such was the situation in the case at bar. Furthermore, in the quoted text analysis, the issue was one of waiver or change, hence the question of the agent's authority was of paramount importance. We need not consider such a question here, for it is not contended that Mr. Hawke presumed to effect either a waiver or a change, nor did Mr. Madric understand him to have done such. Mr. Hawke simply presumed to explain what he thought the policy in fact provided. Through carelessness, his explanation was in error and Mr. Madric was misinformed to his prejudice. Before declaring the estoppel so as to preclude insurer from defending on the restrictive endorsement, I must treat of one other opposition argument as advanced by plaintiff.

It is stated in 29A *Am. Jur.*, Insurance, § 1135, p. 289, that:

"The rule is well established that the doctrines of implied waiver and of estoppel, based upon the conduct or action

of the insurer, are not available to bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom * * *."

On its face, this "rule" would seem to bar the imposition of an estoppel, despite the fact that all of the equities were in favor of its application.

I am not inclined to be bound by this so called "rule", for I am of the opinion that it overstates its case, and that in fact no such rules exists, at least, not absolutely.

For example, the case of *Bower & Kaufman v. Bothwell (Ct. App.* 1927) 152 *Md.* 392, 136 *A.* 892, 52 *A. L. R.* 158, is one of the citations quoted by the text-writer as expressive of the rule. The policy was one of strike insurance. The insurer made a few payments after the loss occurred, then re-examined its position and denied coverage. These few payments were offered as the basis of a waiver or estoppel. The most that *Bothwell* holds is that extension would not there be granted on the basis of a one-sided waiver without consideration. At 894 of 136 *A.*, the Court stated:

"In considering whether there was a waiver of the inapplicability of the policy to losses from this strike, it is to be borne in mind that it is not a forfeiture that is to be found waived, nor a violation of a condition or any irregularity; it is an inapplicability of the policy, so that the waiver argued for would be, in effect, an extension of the contract beyond its defined limits or a new contract. Such an extension would, at least, we think, *require an estoppel*, if not a new consideration, *to support it. * * * There is no element of estoppel here*, as the insured took no action, or placed themselves in no position, in reliance upon the first attitude of the insurer, so that they would now be prejudiced by an abandonment of that attitude."

The implication is clear, if there was an estoppel, a change of position, a detriment, then the coverage would be extended. This, of course, runs counter to the rule as stated in *Am. Jur.*

Furthermore, there is a whole line of authority that precludes an insurer from setting up the defense of non-coverage once it assumes the defense of an action on the policy. See 38 *A. L. R.* 2d 1148, 1151 (1954). The case of *Ziegler v. Ryan* (1939) 66 *S. D.* 491, 285 *N. W.* 875, was such a case and the Court said:

"We believe that under the facts of this case the appellants have estopped themselves by their conduct, upon which Ryan [the insured] relied to his prejudice, from denying that the loss has fallen within the terms of the policy." *Supra* 285 *N. W.* at 879.

I am at a complete loss to understand why coverage can be extended because of an estoppel founded upon insurer's assumption of the defense of an action against insured and cannot be extended on an estoppel founded on such facts as we have at bar, where the prejudice to insured is even greater than in the defense-of-action cases. I take the position that any rule which presumes to advance such an anomaly is clearly without foundation. This conclusion was also reached by the author of a note in 25 *N. Car. Law Rev.* 209, Insurance—Extension of Coverage by Waiver or Estoppel". In examining the above-quoted *Am. Jur.* rule, the author found that:

"An examination of the cases cited by these authorities in support of the proposition discloses the inherent weakness of the generalization. * * * Still, many cases have quoted the 'general rule" with approval. But these cases reveal only the instability of the doctrine and a considerable amount of confusion attending it. And the conclusion is warranted that the cases do not support the doctrine that insurance coverage is not to be extended by waiver or estoppel. In fact, analysis of

the cases supports the opposite conclusion as to estoppel." pp. 211, 212.

We have already seen how this last point was sustained in the *Bothwell* case. Illustrative of some other cases where Courts have declared that extension of coverage might be had through estoppel, though perhaps not through waiver, are: *Keck v. American Fire Ins. Co.* (1942) 237 *Mo. App.* 308, 167 *S. W.* 2d 664; *Palumbo v. Metropolitan Life Ins. Co.* (1935) 293 *Mass.* 35, 199 *N. E.* 335; *Belt Automobile Indemnity Ass'n v. Ensley Transfer & Supply Co.* (1924) 211 *Ala.* 84, 99 *So.* 787; and *Knights and Ladies of Columbia v. Shoaf* (1906) 166 *Ind.* 367, 77 *N. E.* 738. In the *Shoaf* case, deaths from pregnancy were excepted risks and insured so died. The Court said "Appellees cannot, therefore, recover for death resulting from a cause expressly exempted by the terms of the contract, *unless* appellant has been guilty of such misleading conduct as ought to preclude it from receiving the benefit of its alleged defense * * *." *Supra* 77 *N. E.* at 738. Thus, another extension of coverage via estoppel.

Intervening defendant Henderson, in his supplementary brief, cites a multitude of cases wherein estoppel or waiver, or both, were utilized to extend coverage. It will be sufficient if I note but a few as illustrative of this preferred position.

There is a chain of California authority which runs counter to the *Am. Jur.* "rule". In *Ivey v. United National Indemnity Company* (C. A. A. 9, 1958) 259 *F.* 2d 205, 208, the Court held that under California law "an insurance company may by its conduct or dealings apart from the policy itself be estopped from denying that coverage has been furnished for a risk which the insured has been led to believe is protected under the policy." See also *Golden Gate Motor Transport Co. v. Great American Indemnity Co.* (1936), 6 *Cal.* 2d 439, 58 *P.* 2d 375; and *Ames v. Employers Casualty Co.* (1936) 16 *Cal. App.* 255, 60 *P.* 2d 347.

In *American Republic Life Ins. Co. v. Flynn* (1951) 218 *Ark.* 825, 238 *S. W.* 2d 937, 939, the policy excepted coverage for disability resulting from a recurrence of heart trouble. This rider, however, could be removed at the end of two years if a medical examination revealed no heart condition. On 17 February 1950, insured had a heart attack. On 23 February 1950, one of insurer's vice-presidents wrote to insured and stated that the two years were up and the rider was automatically removed, *i.e.*, without a medical examination being had. The policy had a standard no-change non-waiver clause such as in the case at bar. The company denied coverage and the insured brought suit. The lower court held for insured and the Supreme Court affirmed, holding that they were "of the opinion that the Company cannot now successfully contend that a different construction from that expressed in the letter was intended." Hence, the insurer was estopped to assert the defense of non-coverage once its agent had told the insured that he was covered.

Being persuaded by the above-cited cases and others noted in Henderson's brief, I am of the opinion that the *Am. Jur.* rule does not deserve to be followed. I am all the more of that opinion under the facts of this case where the act upon which Madric seeks to impose the estoppel occurred prior to the loss. To this latter point, it is stated in *Patterson, Essentials of Insurance Law*, 2d Ed., § 105:

"Where the insurer's conduct on which the insured relied has occurred before the insured event or the accident imposing liability, there is a stronger case for holding the insurer to be estopped."

This was also observed by Justice Smith in his dissent in the *Flynn* case, *supra* 238 *S. W.* 2d at 940. He stated: "If the insurer's letter had been written before the appellee became disabled, I should agree to affirm the judgment, since the appellee might have relied upon the letter as a reason for not attempting to have the rider removed." In the case at bar, it

can easily be seen that Hawke's misrepresentation detoured Madric from making any further efforts to secure coverage, since he was misled into believing he was already covered.

Based upon the above analyses, I hold that plaintiff insurer is estopped to assert the restrictive endorsement as a defense, thereby attempting to deny coverage for the accident involving James Madric and Wesley Henderson.

All other arguments have been considered and found to be without merit or unnecessary to the disposition of this case.

Plaintiff's motions herewith denied.

On presentation, order, in conformity with this decision, will be entered.