**HARSHBERGER v. TARRSON et al.**

No. 49 C 132.

United States District Court

N. D. Illinois, E. D.
Sept. 22, 1949.

Carlson, Pitzner, Hubbard & Wolfe, Chicago, Ill., for plaintiff.

Thiess, Olson & Mecklenburger, Chicago, Ill., for defendants.

LA BUY, District Judge.

Defendants have filed a motion to dismiss the complaint and for summary judgment based on the pleadings and affidavits of Kellerher and Tarrson and other exhibits.

The facts giving rise to the dispute are as follows. On February 10, 1940 plaintiff, Harshberger, granted an exclusive license to Perry G. Stahly, who, subsequently in accordance with the license terms, assigned it to Birdsell Laboratories, now Stahly, Inc.

The license granted Stahly the "exclusive right and license throughout the world under said inventions, said Letters Patent * * *, said applications for Letters Patent, and the Letters Patent to issue therefrom, to manufacture, use and sell razor devices and replacement parts therefor". The license further provided: "Royalties shall be considered earned and payable on all razors, razor beds, and handle assemblies (embodying any or all of the inventions forming the subject matter of this Agreement) and on all blades manufactured, sold, consigned, transferred, shipped, stored, warehoused, delivered, or otherwise disposed of by Stahly, or by any party or concern acting under his direction or with his consent." A supplemental agreement in October 1942 modified the royalty schedule.

On February 1, 1946 and October 31, 1946 Stahly, Inc. contracted with Aircraft & Diesel Equipment Corporation for the latter to manufacture for it about 125,000 patented safety razors at the rate of 10,-000 a month. In said contract Aircraft admitted the validity of the patents on the Stahly razor and agreed not to manufacture or sell such razors to anyone except Stahly.

The trademarks "Stahly" and "Live Blade" were registered in 1942 by Birdsell Laboratories and Stahly, Inc., is alleged to be the owner thereof in the companion case of Stahly, Inc. v. Jacobs Co., Inc., D.C., 87 F.Supp. 48. In making the razors for Stahly, Inc. Aircraft used dies furnished it by Stahly, Inc., which dies also impressed the marks "Stahly" and "Live Blade".

It is averred in the affidavit of B. Ch. Kellerher, President of Aircraft, that Aircraft manufactured the 125,000 razors during or prior to February, 1948. Of the 125,000 so manufactured. Stahly received and paid for 80,000, leaving in the possession of Aircraft 45,000 razors. These are the razors which are the cause of the dispute. As to these 45,000 razors an effort was made to work out some plan whereby Stahly could take and pay for, or sell to others so as to relieve the serious financial condition of Aircraft and Stahly.

On June 18, 1948 Harshberger alleges that because of the default of Stahly to maintain timely payment of earned royalties, plaintiff terminated the exclsuive license of Stahly, Inc.

On July 9, 1948 Parry G. Stahly, President of Stahly, Inc., communicated with Mr. Kellerher of Aircraft wherein he indicated that the "Premium and Prize outlets" would be the answer to the disposal of this inventory and thus relieve the parties financial straits. None of the plans materialized and Aircraft secured a loan from General Factors Corporation to whom Stahly, as president of Stahly, Inc. wrote on July 21, 1948 stating:

"We understand that Aircraft & Diesel Equipment Corporation has on hand approximately 45,000 Stahly Live Blade Razors which are in the possession of said Aircraft & Deisel Equipment Corporation subject to our order as to shipment.

"In consideration of your making a loan to said Aircraft & Diesel Equipment Corporation, we hereby consent to and agree that we will not assert any rights or claims contrary to your rights to realize upon such security as pledgee thereof in the event of non-payment of the loan."

Aircraft defaulted on its note for $50,-000 secured by 45,000 Stahly Live Blade razors and thereupon said collateral was assigned and transferred to Sidney Tarrson "for valuable consideration" in cancellation of the note of Aircraft. Tarrson's affidavit states that more than ten days before selling or offering to sell to the public, he offered to sell to Stahly, Inc. at a price of $2.75, which offer was refused, that he was closing out his entire stock of these 45,000 razors and when sold would no longer deal in them. Harshberger alleges in his complaint that "General Finance Corporation" on October 29, 1948 represented the balance due from Aircraft to be $130,000 and offered to sell the 45,000 razors to plaintiff and others at a price slightly less than $3.00 and alleges "immediately informed General Finance Corporation of his patent rights in said razors" both verbally and later in writing. On December 8, 1948 the plaintiff alleges he

notified defendants of his patent rights in said razors.

The unlawful acts charged to defendants are alleged to be (1) notwithstanding the notice of December 8, 1948 defendants proceeded in willful and wanton disregard of plaintiff's rights to sell said razors and to offer them for sale, (2) defendants have been selling and offering for sale the accused razors at cut-rate prices drastically below the minimum wholesale and retail prices, (3) plaintiff avers on information and belief that many of the razors contain inherent defects likely to cause failure in their mechanisms after a short period of service, and (4) the unauthorized appearance on the market of quantities of the razors together with rumors circulated in the trade have shaken the confidence of plaintiff's customers and dealers. Plaintiff requests appointment of some person to examine issues as to the sales made by defendant and the damages to which plaintiff would be entitled, for injunction to restrain defendant's infringement of plaintiff's patent by using and selling without plaintiff's consent or license, and injunction to restrain further violation by defendants of the Illinois Fair Trade Act, Smith-Hurd Ann.St. Ch. 121½, § 188 et seq.

The grounds of defendant's motions are (1) failure to state a claim since the complaint while alleging an exclusive license to Stahly, manufacture thereof by Aircraft, and disposal thereof by Aircraft with Stahly's consent, does not deny the razors were made under the license and were therefore freed from plaintiff's patent monopoly, (2) as the license agreement was effective during the time the razors were manufactured by Aircraft said razors were free from the monopoly of plaintiff's patents, (3) plaintiff's only claim is against Stahly for nonpayment of royalties, (4) plaintiff is not a party entitled to bring suit under the Illinois Fair Trade Act since plaintiff has no interest in any name, mark, label or brand under which said razors are sold, (5) defendants have not violated the Illinois act for the transaction complained of comes within the express exception of the Act where goods are being closed out, (6) plaintiff is estopped from suing under the Illinois act because Stahly, Inc., its exclusive licensee waived any rights of action with respect to said razors.

■ The rule in an action by an owner or assignee of a patent against a purchaser of the patented article has been expressed as follows: " * * * as between the owner of a patent, on the one side, and a purchaser of an article made under the patent, on the other, the payment of a royalty once, or, what is the same thing, the purchase of the article from one authorized by the patentee to sell it, emancipates such article from any further subjection to the patent throughout the entire life of the patent, even if the latter should be by law subsequently extended beyond the term existing at the time of the sale." Keeler v. Standard Folding Bed, 1894, 157 U.S. 659, 15 S.Ct. 738, 740, 39 L.Ed. 848. And again in Mitchell v. Hawley, 16 Wall. 544, 83 U. S. 544, 21 L.Ed. 322: "Patentees acquire by their letter patents the exclusive right to make and use their patented inventions and to vend the same to others to be used for the period of time specified in the patent, but when they have made one or more of the things patented, and have vended the same to others to be used, they have parted to that extent with their exclusive right, as they are never entitled to but one royalty for a patented machine, and, consequently a patentee, when he has himself constructed a machine and sold it without any conditions, or authorized another to construct, sell and deliver it, or to construct and use and operate it, without any conditions, and the consideration has been paid to him for the thing patented, the rule is well established that the patentee must be understood to have parted to that extent with his exclusive right, and that he ceases to have any interest whatever in the patented machine so sold and delivered or authorized to be constructed and operated."

Under the terms of the license Stahly had the right to "make, use and sell" razor devices and become liable for royalties "on all blades manufactured, sold, consigned, transferred, shipped, stored, warehoused, delivered, or otherwise disposed of by Stahly, or by any party or concern acting under his direction or with his consent".

This paragraph concededly takes into account the fact that such razors could be manufactured, sold, consigned, transferred, shipped, stored, warehoused, delivered or otherwise disposed of" by Stahly or any other party acting under his direction or with his consent and Stahly would become liable to Harshberger for the royalties under the license. It is therefore clear that Stahly was within his license rights in having the articles manufactured by Aircraft and Harshberger does not claim otherwise herein.

On June 14, 1948 with the termination of Stahly's exclusive license, the issue arises whether the 45,000 razors in question were manufactured during the period of the license with Stahly giving effect to the royalty provision and thereby removing the patented article from the plaintiff's patent monopoly pursuant to the rule announced in the above cases. To this end, the affidavit of B. Ch. Kellerher, president of Aircraft is submitted wherein he avers that said razors "were all completed on or prior to the month of February, 1948". Plaintiffs in their brief state they are in no position to disprove such allegation without discovery, but have not controverted the affidavit either in their pleadings or affidavits. Under such a situation, the fact so stated in Kellerher's affidavit, who as president of Aircraft would be competent to testify to the fact, must be taken as true. The plaintiff's statement that he could not present facts by affidavit in opposition to a motion for summary judgment because the facts were particularly within the knowledge of the defendant was held inadequate in the absence of an attempt to show what steps plaintiff had taken to obtain the desired information. Hummel v. Riordan, D.C.Ill.1944, 56 F. Supp. 983; Gray v. Amerada Petroleum Corp., 5 Cir., 1944, 145 F.2d 730. So, where plaintiff neither filed a controverting affidavit nor offered opposing proof, the contention that a substantial controversy of fact existed between the parties cannot be considered on plaintiff's own statement.

It is therefore taken by this court to be the fact that said razors were manufactured before the license agreement was terminated. That being so, the rule as stated by the United States Supreme Court applies and the razors are free from the plaintiff's patent monopoly.

The royalty clause which takes into account the situation under which royalty is deemed earned and payable, "or otherwise disposed of by Stahly or by any party or concern acting under his direction or with his consent" contemplates and intends that Stahly have complete control of the licensed product, with a restriction only on sub-licensing. His action in consenting to the pledging of the razors to General Factors Corporation was within the rights given him by his license.

Does the fact that plaintiff notified General Factors Corporation in October 1948 of its patent rights alter this right of unconditional disposal of the product exercised by Stahly and would the fact that General Factors and Aircraft may be chargeable with knowledge of plaintiff's patent rights operate to restrict the use of said razors by Tarrson? There was no restriction placed by the license agreement upon the manner of the disposition of the razors and plaintiff having become entitled to their royalty cannot now assert such articles to be subject to its patent monopoly.

The court is of the opinion that plaintiff's pleadings, affidavits and exhibits on file in support of its cause for patent infringement raise no issue of fact to be tried and as to this claim the defendants' motion for summary judgment is granted, and an order has this day been entered in accord herewith.

Plaintiff also alleges damages arising from the alleged violation by defendants of the fair trade agreements entered into by Stahly, Inc. and its distributors and dealers for the maintenance of certain prices. In Boston Store v. American Graphophone Co. et al., 1917, 246 U.S. 8, 38 S.Ct. 257, 261, 62 L.Ed. 551, Ann.Cas. 1918C, 447, the American Company acting through its agent Columbia entered into a system of price maintenance and caused Columbia to make contracts in the name of Columbia with dealers in records to whom American delivered its products through

Columbia and by which in consideration of the prices fixed the dealers obligated themselves to adhere thereto. The American Company fixed the prices of its product and Columbia in the contract with dealers included a notice that violation of such prices would make such violator an infringer of the patents under which American Company manufactured the records. Boston Store was one of the dealers with whom Columbia contracted and the action by American Company and Columbia arose through an alleged violation by Boston Store of the fixed price. The court certified certain questions to the Supreme Court, one of them being: "Can a patentee, in connection with the act of delivering his patented article to another for a gross consideration then received, lawfully reserve by contract a part of his monopoly right to sell?" The Supreme Court answered the question in the negative and in arriving at this conclusion, said: " * * * In addition, through perhaps an abundance of precaution we direct attention to the fact that nothing in the decided cases to which we have referred, having regard either to the application of the general law or of the patent law, deprives an inventor of any right coming within the patent monopoly, since the cases alone concerned whether the monopoly of the patent law can be extended beyond the scope of that law or, in other words, applied to articles after they have gone beyond its reach. The proposition so earnestly insisted upon that while this may be true, it does not fairly consider the reflex detriment to come to the rights of property of the inventor within the patent law as a result of not recognizing the right to continue to apply the patent law as to objects which have passed beyond its scope, is obviously not one susceptible of judicial cognizance. This must be since whether for the preservation of the rights which are within a law, its provisions should be extended to embrace things which it does not include typically illustrates that which is exclusive of judicial power and within the scope of legislative action."

Has the Illinois Fair Trade Act given such a right of extension to a patent owner who is not the owner of a trademark, is not a manufacturer nor producer or vendor? Plaintiff contends that Section 2 of the Act gives him such a right since his interest in the property and good will attached to his invention has been damaged. Section 2 is as follows: "Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of section 1 of this Act, whether the person so advertising, offering for sale or selling is or is not a party to such contract, is unfair competition and *is actionable at the suit of any person damaged thereby.*" (Italics supplied.)

In Triner Corporation v. McNeil, 363 Ill. 559, at page 577, 2 N.E.2d 929, 937, 104 A.L.R. 1435, the purpose of the Act is aptly set forth: " * * * The Fair Trade Act does not assume to permit restrictions on the price at which trade-marked commodities may be resold, irrespective of whether resold under the trade-mark. It permits restrictions to be placed on the use of trade-marks, names and brands—not restrictions on the price or commodities generally, except as the plaintiff contends, to the extent that new commodities may become involved in an attempt to damage the good will built around a trade-mark, name, or brand. The manifest legislative intent is the protection of the property interest in a mark, name, or brand by preventing the use of the symbol by price-cutting retailers in ways likely to depreciate the property interest. * * * Price-cutting primarily injures the owner of a good will which has become identified with a trade-mark, brand, or name, on a commodity competing in the market with other goods of the same general class. On the other hand, the manufacturers and distributors of commodities which bear no trade symobol obviously cannot have a good will which requires the protection afforded by the Fair Trade Act"; And again, 363 Ill. at page 579, 2 N.E.2d at page 938, 104 A.L.R. 1435: "On the other hand, the Fair Trade Act of 1935 has for its major objective the preservation and protection of the property interest of the producer and

his distributors in the good will represented by brands, trade-marks, and trade-names."

It appears clear, therefore, the protective cloak of the act extends to the protection of the property interest in the good will represented by brands, trademarks and trade names. The plaintiff asserts a good will arising separate and apart from that occasioned by the use of any symbol; that good will is alleged to arise through the invention itself, separate and apart from the name used to sell it. Plaintiff is the owner of the patent, but is not the owner of the trade symbols "Stahly" and "Live Blade" used to market the device. While it is true such good will could be injured through alleged price cutting of the trademarked article it does not appear that the Illinois act covered or intended to cover anything other than the good will arising from the use of the trademark by the injured party. Plaintiff's notice given to defendants and to General Factors cannot serve to extend his monopoly to sell when in fact under the license agreement he made no provision for its extension beyond the royalty and sublicensing phase.

There being no cause of action alleged under the Illinois Fair Trade act, defendants' motion to dismiss that part of the complaint is sustained, and an order has this day been entered dismissing the action.