**CYRIX CORPORATION, Plaintiff,**

v.

**INTEL CORPORATION, Defendant,**

v.

**SGS–THOMSON, Intervenor.**

No. 4:90cv264.

United States District Court,
E.D. Texas,
Sherman Division.

July 24, 1992.

**1202**

Richard Edward Harrison, Joseph Wilbur Wolfe, Henderson Bryant & Wolfe, Sherman, Tex., Harry M. Reasoner, Vinson & Elkins, Houston, Tex., Robert C. Walters, Vinson & Elkins, Dallas, Tex., Albert E. Fey, Fish & Neave, New York City, for Cyrix Corp.

James Patrick Bradley, Dale B. Nixon, Richards Medlock & Andrews, Frank Finn, Thompson & Knight, Dallas, Tex., David T. Pritikin, Thomas D. Rein, Sidley & Austin, Chicago, Ill., Raphael V. Lupo, Jack Q. Lever, Jr., Sandra A. Sellers, Willian, Brinks, Olds, Hofer Gilson and Lione, Washington, D.C., Peter J. Thoma, Richards Medlock & Andrews, Dallas, Tex., for SGS–Thomson Microelectronics, Inc.

Stephen D. Susman, Susman Godfrey, Paul Martin Janicke, Patricia Newman Brantley, Wayne Manford Harding, Arnold White & Durkee, Houston, Tex., J. Thomas Rosch, Daniel M. Wall, Jordan C. Budd, Terry J. Houlihan, Jared W. Huffman, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., Clyde Moody Siebman,

Siebman & Reynolds, Plano, Tex., Terrell W. Oxford, Ophelia S. Camina, Thomas A. Adams, IV, Susman Godfrey, Dallas, Tex., for Intel Corp.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PAUL N. BROWN, District Judge.

The above entitled and numbered cause was called for trial before the Court without a jury on January 20, 1992, in the United States Courthouse in Sherman, Texas, and the Court having heard all the testimony and considered all admissible evidence, as well as the argument of counsel and their proposed findings and conclusions, hereby enters its findings of fact and conclusions of law as to the patent licensing issues in this case in conformity with Fed.R.Civ.P. 52. Any finding of fact which constitutes a conclusion of law shall be deemed a conclusion of law and any conclusion of law which constitutes a finding of fact shall be deemed a finding of fact.

## FINDINGS OF FACT

*The Parties*

1. Plaintiff, Cyrix Corporation ("Cyrix"), is a Delaware corporation with its principal place of business in Richardson, Texas.

2. Defendant, Intel Corporation ("Intel"), is a Delaware corporation with its principal place of business in Santa Clara, California.

3. Intervenor, SGS–Thomson ("ST"), is a Delaware corporation with its principal place of business in Carrollton, Texas.[1]

*Nature of the Action*

4. This is a civil action originally commenced by Cyrix against Intel. ST has

---

1. ST is the corporate successor to the original Mostek Corporation ("Mostek"). Mostek's name has changed several times since 1985. In November 1985, Mostek, then a division of United Technology Corporation ("UTC") was sold to Thomson Semiconductors, Inc. ("TSI"). In January 1986, TSI changed its name to Thomson Components–Mostek Corporation ("TCMC"). Subsequently, in November 1987, TCMC once

again changed its name to SGS–Thomson Microelectronics, Inc. ("ST"). In December 1987, SGS Semiconductor Corporation ("SGS"), Thomson Holdings Inc., and ST merged (the "merger"). SGS was the surviving corporation and changed its name to ST at the effective time of the Merger. For convenience, the Court shall refer to Mostek as it is currently known "SGS–Thomson" ("ST"), unless otherwise indicated.

intervened in this action seeking a declaratory judgment that it is the successor and assignee of the Intel–Mostek license at issue. Only the patent licensing issues are before the Court at this time. These issues are whether 1) ST is the successor and assignee of the Intel–Mostek license agreement, 2) whether Intel is barred from challenging ST's ownership of the Intel–Mostek License Agreement under the doctrine of ratification, waiver, laches, and/or equitable estoppel, and 3) whether the Patent Exhaustion Doctrine bars Intel from bringing a patent infringement action against Cyrix.[2] Intel has stipulated that, if ST is the owner of the Intel–Mostek license, the FasMath coprocessors made and transferred to Cyrix by ST are "Licensed Products" within the meaning of the Intel–Mostek agreement.

*The Patents and Products at Issue*

5. The patent at issue is the "Numeric Data Processor," United States Patent No. 4,338,675 ("the '675 patent"), which was originally issued to Intel in July 1982. United States patent Re. 33,629, entitled "Numeric Data Processor", is a reissue of the '675 patent. The reissue patent issued July 2, 1991, based on an application filed June 1, 1990. The reissue patent has five claims (claims 1, 5, 7, 8 and 10), having the identical wording as corresponding claims 1, 5, 7, 8 and 10 of the '675 patent.[3]

6. The products at issue in this action are math coprocessors designated as Cyrix's FasMath CX–83D87, CX–83S87, CX–82S87, and the AutoMath coprocessors (jointly Cyrix's "FasMath" coprocessors). The FasMath coprocessors are used in personal computers to speed up mathematical operations that would otherwise be performed by the microprocessor of the computer.

7. Each FasMath coprocessor is a tiny silicon "chip," or "die," less than one-half inch on a side and containing more than 200,000 transistors. It is packaged in a protective housing having an array of met-al pins that are used to plug the chip into a computer circuit board.

*The License Agreement*

8. In March 1977, Intel and Mostek entered into a cross-license agreement (the "License Agreement"), the terms of which provided that each party granted to the other a license "to make, to have made, to use, to sell (either directly or indirectly), to lease and to otherwise dispose of Licensed Products." The original term of the License Agreement was ten (10) years, but the agreement was extended to twenty-two (22) years pursuant to an amendment in November 1982.

9. Under the License Agreement, "Licensed Products" are defined as "any product [including Intel's '675 patent] manufactured, used or sold by either party covered by patents of the other party." The express written terms of the License Agreement do not restrict or limit in any way the manner or method by which "Licensed Products" may be manufactured, used, or sold.

10. Under the License Agreement, each party released the other from any past patent infringement, and Mostek agreed to pay to Intel a one-time royalty payment of $100,000 on March 1, 1987.

11. The License Agreement provides that the license may be assigned, without the other party's consent, to a successor in ownership of "all or substantially all the assets of the assigning party," provided the successor expressly assumes the assigning party's obligations under the License Agreement. The License Agreement also provides that Delaware law governs its interpretation.

*Notice of the Assignment*

12. Intel received notice of the sale of Mostek assets to ST, the assignment of the License Agreement to ST, and the assumption of the obligations of Mostek under the Agreement by ST. Robert E. Caldwell of ST, by letter dated November 15, 1985,

---

**2.** Cyrix's antitrust and unfair competition claims against Intel and Intel's patent infringement claim against Cyrix will be tried, if necessary, at a later date.

**3.** For purposes of these Findings of Fact and Conclusions of Law, both the original patent and the reissue patent will be referred to as the '675 patent.

notified Intel that ST had acquired substantially all of Mostek's assets and had been assigned the License Agreement. By letter dated December 9, 1985, Ross E. Evans of Mostek and Robin Sears of ST jointly notified Intel of the sale and assignment. Furthermore, Mostek's sale of assets to ST was widely publicized in major newspapers, periodicals, and trade publications within the semiconductor industry which were regularly read by Intel employees, officers and directors.

13. Numerous publications that reported the sale of Mostek's assets to ST stated that not all of Mostek's assets were sold, and many reports included the nature of the assets not sold to ST.

14. Intel had the ability to conduct its own independent investigation of the Mostek–ST sale and ST did nothing to prevent such an investigation.

15. By letter dated April 21, 1988, ST notified Intel that ST was the successor by merger to TSI and had assumed all of the obligations, terms, and conditions of the License Agreement.

16. ST has fulfilled all its obligations under the License Agreement including the payment of the $100,000 royalty.

*Negotiating the Mostek–Intel License Agreement*

17. At the time of the Intel–Mostek License Agreement, Intel and Mostek were both engaged in custom product manufacturing.[4] Custom product manufacturing, which today is known as "foundry" work, refers to arrangements in which a semiconductor company makes and sells to its customers integrated circuit products, the designs for which were developed or owned by the customers. At this time, about 15% of Mostek's business was foundry work. One of Mostek's foundry customers at that time was Zilog Corporation ("Zilog"), for whom Mostek made the "Z80" microprocessor. The Z80 was sold in competition with Intel's microprocessors.

18. Intel was aware of Mostek's relationship with Zilog at the time the Intel–Mostek Agreement was negotiated, and that Mostek was making and selling microprocessors to Zilog. This was a matter of public knowledge that was reported in the trade press. Moreover, the Mostek–Zilog relationship was specifically brought to Intel's attention during the license negotiations. Mostek's President, L.J. Sevin, informed Intel's Chairman, Robert Noyce, about the Zilog relationship and Sevin understood from Noyce that the Z80 would be a "Licensed Product."

19. Intel also was acting as a foundry for its customers at the time the Intel–Mostek License Agreement was negotiated. One of those customers was Reticon, for whom Intel made integrated circuits, the design of which Reticon had developed and owned. At the time of the Intel–Mostek Agreement, Mr. Sevin also was aware of Intel's foundry relationship with Reticon. Intel has also engaged in its own foundry activities with other companies, such as Weitek, Unisys, Reticon, Altera, Analog Devices and others, pursuant to which Intel agreed to make and sell integrated circuits wafers or dice that had been designed by those companies. Those agreements provided that Intel was "manufacturing" and "selling" integrated circuits in wafer or packaged form that were the subject of those agreements.

20. Intel was also acting as a foundry in November 1982, when the Intel–Mostek Agreement was amended and extended by 12 years to 1999, and at this time it had begun foundry-type operations at its Chandler, Arizona facility.

21. The License Agreement was drafted, negotiated, and executed on behalf of Intel by Roger Borovoy, then Intel's Vice President, Secretary, and General Counsel. L.J. Sevin, then Mostek's President and CEO, acting with Mostek's lawyer Merlyn

---

**4.** ST's activities in making and selling to its customers products based upon designs developed in whole or in part by those customers is called, in the semiconductor industry today, a "foundry" business. Custom product manufac- turing, as it was referred to in the 1970's, can take several forms including a second source relationship whereby a manufacturer makes the product and sells it itself under its own brand name.

Sampels negotiated and executed the License Agreement on behalf of Mostek.

22. The Intel–Mostek License Agreement was intended by Borovoy and Sevin to create "very broad" licenses, designed to grant each party all rights to the other party's patents to prevent patent litigation between the parties "until at least the year 2000." Borovoy's and Sevin's goals were to ensure complete patent peace between Intel and Mostek for the term of the Agreement and broad freedom of action for Intel and Mostek to pursue their business activities.

*The Semiconductor Industry's Licensing Practices*

23. When Intel was founded in 1968, the semiconductor industry was dominated by a few large companies, such as IBM, AT & T, Motorola, Fairchild, and Texas Instruments, who had been making chips in the semiconductor industry for years and owned or controlled large patent portfolios. These companies owned patents on basic inventions relating to semiconductor devices and processing.

24. For relatively new companies starting out in the semiconductor industry in the 1970's, there was a serious concern that the patent position of the dominant companies would limit the newcomers' ability to compete. Therefore, the new companies adopted a strategy of increasing the size of their patent portfolios so that they would be in a position to negotiate broad cross-license agreements.

25. In the 1970's, Intel's licensing strategy was consistent with the industry-wide strategy—to grant broad, unlimited patent licenses in exchange for cross-licenses back of equal scope.

26. Today, Intel has changed its strategy. Now a significant force in the semiconductor industry, Intel believes that its patent position is so unbalanced relative to others in the industry that it seeks significant monetary compensation for patents in the process of negotiating licenses.

*The Design and Manufacture of FasMath Coprocessors*

27. The FasMath coprocessors at issue were designed by Cyrix subject to limitations and requirements for the design that were set by ST. Cyrix's and ST's engineers collaborated in designing the FasMath coprocessors, and the final design includes proprietary information of both Cyrix and ST. Because of these joint rights in the FasMath design, the computer data tapes for that design can not be given to a third party by either ST or Cyrix without the permission of the other.

28. Cyrix was responsible for the initial design of the FasMath coprocessor. All of Cyrix's design work was carried out by hand and computer simulation. Cyrix, however, never built or used any physical circuits.

29. Cyrix, on a confidential basis with the assistance of ST's engineers, then incorporated in the FasMath design ST's trade secret "design rules" (integrated circuit tolerances and transistors specifications). The result was a computer data tape for the FasMath design, which Cyrix gave to ST, that contained trade secrets and other proprietary information of both Cyrix and ST.

30. ST subsequently added more design information of its own to that contained on the computer data tape. For example, ST added, among other things, the "active" layer of the FasMath coprocessor, which is the layer actually forming the circuit's transistors.

31. The result of these additional design steps by ST was the creation of a final computer data base tape which was used by a ST subcontractor to make the "reticles" or "masks" needed by ST to actually manufacture the FasMath coprocessors.

32. Once the design is completed, ST commences the manufacturing process with a blank wafer of silicon six inches in diameter. During manufacture, successive layers of semiconductive, conductive, and insulating material are fabricated in the wafer to create a large number of individual FasMath chips or die in each wafer. Each FasMath wafer contains more than one hundred individual FasMath die.

33. The blank wafers and all other raw materials used by ST to manufacture the FasMath design are purchased by ST from third-party commercial vendors.

34. ST, using solely its own equipment, primarily controls the manufacture of Fas-Math coprocessors. Cyrix does not, either alone or jointly with ST, manufacture Fas-Math coprocessors, but Cyrix has some control over quantity and timing of the units delivered, as well as the type of masks used.

35. All raw materials used by ST in the manufacture of FasMath coprocessors, including the reticles used to actually make them, are owned by ST. Cyrix does not own or provide to ST any component of the FasMath coprocessors which ST manufactures.

36. Every step of the manufacturing process which converts ST's raw materials into finished FasMath coprocessors is performed by ST.

37. After ST has finished manufacturing a FasMath wafer, ST is the first user of the wafer when it tests each die on the wafer to determine which coprocessors work and which do not. During these tests, ST tests all of the mathematical and other operations of the coprocessor. Any coprocessor die that fails these tests is "inked" by ST with a blank dot and ultimately discarded.

38. ST sells FasMath coprocessors to Cyrix in both wafer and individually packaged form.

39. ST solely owns the FasMath circuits it makes, and ST alone bears the risk of loss for those circuits until ST delivers the circuits to Cyrix.

*ST's Acquisition of Mostek's Assets*

40. On November 13, 1985, ST acquired and continued Mostek's business of designing, manufacturing, and marketing semi-conductors as a going concern. Pursuant to an Asset Purchase Agreement (the "Purchase Agreement") between Mostek and ST, ST purchased all of Mostek's assets that were necessary to the continued operation of Mostek's business as a going concern, excluding only certain designated assets. For instance, all of ST's initial employees were former Mostek employees.

41. The acquired assets represented more than 92% of the net book value [5] of Mostek's total assets that could be acquired in an asset acquisition, as adjusted to exclude cash equivalents.

42. When all necessary adjustments were made to the net book value of Mostek's total assets, the acquired assets represented more than 99% of the adjusted net book value of Mostek's total assets.[6]

43. ST acquired all of Mostek's fabrication units, all of which were located at Mostek's headquarters in Carrollton, Texas. ST acquired all of the land, buildings, equipment, and leasehold improvements associated with these fabrication units.

44. ST acquired all of Mostek's operating assembly and test facilities located in Carrollton, Texas and Penang, Malaysia.

45. ST acquired all of Mostek's fabrication unit facilities devoted to research and development, also located in Carrollton, Texas.

46. ST acquired all of Mostek's inventory, except for approximately $5.6 million in book value of inventory which was located in Ireland, owned by Mostek's Irish subsidiary, and later determined by Mostek's parent company, United Technologies Corporation, to be of little or no value. The book value of the acquired inventory was approximately $12.3 million.

47. ST acquired substantially all of Mostek's work in process and unfilled customer orders.

5. Book value is the historical cost of an asset that is recorded on the books of a company. In contrast, fair market value is the actual value of an asset that a willing buyer and seller would establish.

6. Necessary balance sheet adjustments included subtracting cash and cash equivalents such as accounts receivable and prepaid expenses, subtracting non-operating assets such as the facility in Ireland and vacant land in general, subtracting non-acquirable items such as tax benefit receivables, accounting errors, and adding back in intangible assets such as patents, licenses, trademarks, and other intellectual property.

48. ST acquired from both Mostek and UTC an agreement not to compete with ST, thereby protecting ST's relationships with Mostek's customers.

49. ST acquired Mostek's name, all of Mostek's trademarks, and all of Mostek's customer records.

50. ST acquired all of Mostek's patents (approximately 125 in total). In addition, ST acquired all of Mostek's other intellectual property which could be acquired in an asset acquisition,[7] including all of Mostek's rights under patent licenses and second source agreements (approximately 40 in total), specifically including the License Agreement, and all of Mostek's rights in approximately 480 other specifically identified patent applications, patent declarations, product designs, and other pieces of intellectual property.

51. Mostek's intellectual property that was not acquired by ST could not have been acquired in an asset acquisition and thus should not be considered in determining whether all or substantially all of Mostek's assets were acquired.

52. Under the Purchase Agreement, all outstanding licenses of intellectual property granted by Mostek to UTC or any of UTC's direct or indirect subsidiaries were canceled. The only intellectual property of Mostek not acquired by ST was property "relating uniquely to any work done by [Mostek] with respect to NORD MICRO[8] or to the MIL–STD–1553 Data Bus."[9] No patents or intellectual property licenses were included as a part of this intellectual property. No specific items of intellectual property have been identified as being retained by UTC in this connection.

53. Under the Purchase Agreement, UTC guaranteed that none of Mostek's intellectual property had been transferred to UTC or any of UTC's direct or indirect subsidiaries since January 1, 1985.

54. The entry on Mostek's balance sheet described as "goodwill" represented the value of Mostek's intangible assets, such as its intellectual property, its name, and its trademarks, all of which were acquired by ST. Mostek's patent portfolio has had significant value since 1977.

*The Negligible Value of the Excluded Assets*

55. The assets which were not acquired by ST (the "excluded assets") were not necessary for the continued operation of Mostek's business as a going concern.

56. The only fabrication unit that had been owned by Mostek and not acquired by ST was located in Colorado Springs, Colorado. Mostek's operations at this unit had been discontinued in early May 1985 and had represented less than 15% of its fabricating capacity. The Colorado Springs facility was transferred to another subsidiary of UTC, United Technologies Microelectronics Center, Inc.[10] ("UTMC"), in approximately August 1985 prior to the Purchase Agreement. ST did, however, acquire approximately one-half of the equipment in November 1985 that had been used in Mostek's former Colorado Springs fabrication unit. Because the Colorado Springs facility did not belong to Mostek in November 1985 and was not necessary to its ongoing business operations, the assets transferred to UTMC should not be considered in determining whether all or substantially all of Mostek's assets were acquired by ST.

57. The test facility located in Blanchardston, Ireland that had been used by Mostek and not acquired by ST was owned by an Irish subsidiary of Mostek. In September 1985, prior to UTC's reaching a final decision whether to sell Mostek, Mos-

---

7. Intel's expert witness Mr. Warner, testifying as to the acquisition of assets in the Purchase Agreement, omitted in his analysis intellectual property—perhaps the single most important asset in this acquisition.

8. Nord Micro was an overseas affiliate of UTC.

9. UTMC was developing a product described as a "UT1553B RTI" with "complete MIL–STD–1553B remote terminal compliance" as early as March 1985. This was a military product which had applications in avionics and defense systems.

10. UTMC, formed in 1982, functioned as an in-house design team to UTC which took semiconductor technology and devices for purposes of integrating them into other divisions of UTC other than Mostek.

tek had decided to close its assembly and test facility in Ireland, and such fact had been communicated to the Industrial Development Authority of Ireland. The facility was closed because the principal customer for which the products were assembled and tested in Ireland had ceased buying the products assembled and tested there. It represented approximately 16% of Mostek's assembly and test capacity.

58. UTC retained the stock of Mostek's Irish subsidiary, which had no value. The inventory owned by the Irish subsidiary was obsolete and had an actual value of only $100,000. It cost UTC more than $5,000,000 to complete the liquidation of this subsidiary.[11]

59. UTC retained Mostek's "net accounts receivables," which had a book value of $20.4 million. Because accounts receivables are merely a cash equivalent whose value would have to be discounted to reflect collection risks and the time value of money, they often are not acquired in asset purchases where the buyer can supply working capital. ST was able to supply its own working capital and chose to do so. Thus, Mostek's accounts receivable should not be considered in determining whether all or substantially all of its assets were acquired. This analysis is also true with respect to other cash equivalents, such as claims for tax refunds, deposits, and prepaid expenses.

60. The entry on Mostek's balance sheet described as "other assets," and showing a book value of approximately $1.1 million, represents assets most of which, with the exception of cash equivalents, were acquired by ST. Approximately one-half of these assets (cash equivalents and demo equipment in European sales office) were not acquired.

61. The entry on Mostek's balance sheet described as "tax benefit receivable" was not an asset that could have been acquired in an asset purchase transaction.

62. The entry on Mostek's balance sheet described as "accounting errors," retained by UTC and showing a book value of $4,690,000, does not represent an asset that could be acquired in an asset purchase transaction.

63. The entry on Mostek's balance sheet described as "leasehold improvements" made to buildings in Carrollton, retained by UTC and showing a book value of $1,190,-000, is not significant alone or in combination with other assets because the buildings were not necessary to continue the operation of Mostek's business. ST did not assume the leases for these buildings.

64. The entries on Mostek's balance sheet described as "Brussels/Europe, Hong Kong and Tokyo," retained by UTC and showing an aggregate book value of less than $1 million, do not represent assets that were significant alone or in combination with other assets. These assets were comprised of furniture and office equipment in certain overseas sales offices that were not necessary to meet the needs of the ongoing business operations.

65. The entry on Mostek's balance sheet described as "Colorado Springs land," retained by UTC and showing a book value of $948,000, was not significant alone or in combination with other assets. This was raw, undeveloped land which was not used in Mostek's business.

66. No value can be attributed to the interest in Eurosil retained by UTC. Eurosil was a German corporation in which Mostek and UTC each had a minority interest. Eurosil's operating losses apportioned to Mostek over the years had exceeded Mostek's cash investment in Eurosil. As part of a restructuring of Eurosil in 1986, UTC had to surrender Mostek's share in Eurosil, without receiving anything in return, and to contribute additional capital.

67. No value can be attributed to the interest retained by UTC in the Microelectronics and Computer Technology Corporation ("MCC"), a consortium of more than twenty (20) semiconductor companies. This investment had been written down to

---

11. The total cost to UTC of closing the Irish facility, including inventory written off, was ap-

proximately $20 million.

zero book value. UTC and Mostek were compelled to pay out more in fees to MCC after November 13, 1985 than they eventually collected from the sale of the MCC interest.

68. The assets of the systems technology division of Mostek were transferred to Hamilton Standard Digital Systems, Inc. ("HSDS"), another UTC subsidiary, in May 1985. The systems technology division was engaged in a different line of business from the principal business of Mostek. It did not design or manufacture semiconductor chips. Rather, it designed and built circuit board products utilizing semiconductor chips such as those designed and manufactured by Mostek. The transfer of Mostek's systems technology division to HSDS was unrelated to the decision of Mostek to sell all or substantially all of its assets. For these reasons, the assets transferred to HSDS should not be considered in determining whether all or substantially all of Mostek's assets were acquired by ST.

69. The assets transferred to HSDS did not represent a significant part of Mostek's business. Most of the assets transferred to HSDS consisted of accounts receivable and inventory. Any intellectual property transferred to HSDS was returned to Mostek and transferred to ST. All intellectual property licenses granted by Mostek to HSDS were canceled under the Purchase Agreement. HSDS had little or no value in November 1985 and UTC's management recommended that its operations be discontinued. Its book value was written down to zero by UTC in December 1985.

70. Only two transfers of assets from Mostek to affiliated UTC companies occurred during 1985 prior to the sale of Mostek's assets to ST. These transfers related to the closed fabrication unit in Colorado Springs and to HSDS. Notwithstanding these transfers of assets, Mostek's fixed assets (before depreciation) at September 30, 1985 were greater than its gross fixed assets at September 30, 1984.

71. Following ST's acquisition of Mostek's assets, there were virtually no assets of any value left at Mostek and Mostek was left with no ongoing business operations.

*Equitable Findings*

72. Knowledge of material facts can be imputed to Intel because Intel received notice of the sale of the Mostek assets to ST and had the means of obtaining knowledge of its rights, if any, when (1) it received the November 15, 1985 and December 9, 1985 letters notifying it of the assignment, and (2) news and industry publications reported the sale of Mostek's assets to ST and indicated the nature of the assets not included in the sale.

73. Between November 15, 1985 and January 1991, Intel did not inform ST that it considered the assignment of the Intel–Mostek Agreement to ST to be invalid and not binding upon Intel and instead continued to enjoy all the benefits conferred by the License Agreement.

74. Despite its knowledge that ST's acquisition did not include one hundred percent of Mostek's assets, Intel did nothing to investigate which assets had been acquired and which had not.

75. For more than five years following Mostek's assignment and sale of its rights and obligations under the License Agreement to ST, Intel: (a) made no objection of any kind to the assignment; (b) treated ST, notwithstanding its name changes and the merger into ST, as Mostek's assignee; and (c) accepted all the benefits of the License Agreement.

76. By letter dated March 27, 1987, Intel sought from ST the $100,000 payment pursuant to the terms of the License Agreement.

77. Intel's demand for and acceptance of $100,000 pursuant to the terms of the License Agreement reasonably warranted ST's conclusion that Intel had accepted or adopted the valid assignment of rights from Mostek to ST.

78. By letter dated April 29, 1988, ST sent Intel copies of documents relating to the License Agreement and referred to the "mutually beneficial license relationship between [the] two companies." Intel took no action to challenge, correct, or dispute the

documents tendered or this description of the status of the parties with respect to the License Agreement. Instead, it entertained negotiations initiated by ST to expand the relationship.

79. By letter dated February 1, 1989, and pursuant to Article VII of the Agreement, ST informed Intel of an address change and stated that it would "continue to perform all of its obligations pursuant to [the License Agreement]."

80. By letter dated March 1, 1989, Intel informed ST that it was considering an ST proposal concerning "the existing license agreement ..."

81. Intel was aware of ST's acquisition of Mostek's assets, including the License Agreement, from the inception of the transaction between Mostek and ST.

82. ST relied upon the License Agreement with Intel and Intel's statements, action, and conduct since 1985 in entering into other business arrangements, contracts, and obligations with third-parties.

83. Intel conducted its business affairs since 1985 in a manner that suggested to ST and others that ST was licensed under Intel's patents and vice versa.

84. Based upon Intel's express representations to ST that the License Agreement was binding upon ST and Intel, ST entered into business relationships with third parties which were predicated upon ST's continued exercise of its rights under the License Agreement.

85. Since 1985, Intel's statements, actions, and conduct represented to ST that the License Agreement was valid.

86. ST did not misrepresent to Intel the nature of the assets acquired from Mostek. Therefore, Intel was not wrongfully induced in seeking and accepting the $100,000 payment from ST.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and over the subject matter of this action pursuant to 28 U.S.C. §§ 1337(a), 1338(b), and 1367(a). Venue in this Judicial District is proper.

2. In accordance with the express language of the Intel–Mostek License Agreement, Delaware law applies to and governs the interpretation of the Agreement. Both Intel and Mostek were Delaware corporations when the Agreement was executed.

■ 3. In applying state law to patent licenses agreements, Delaware courts look to their own state law precedent as well as to the Court of Appeals for the Federal Circuit (and its predecessors—the Court of Customs and Patent Appeals and the Court of Custom Appeals) for the interpretation of similar licenses. *See E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.,* 498 A.2d 1108, 1115 (Del.1985).

4. A corporate name change does not affect the legal existence or any of the rights or obligations of the corporation and does not involve any change in ownership of its assets. Delaware General Corporation Law §§ 102, 242 (1991); *see also Ozan Lumber Co. v. Davis Sewing Mach. Co.,* 284 F. 161 (D.Del.1922) (identity of corporation not affected by amendment to charter merely changing its name), *aff'd,* 292 F. 135 (3d. Cir.1923).

*Contract Interpretation*

5. "The proper interpretation of language in a contract, while analytically a question of fact, is treated as a question of law both in the trial court and on appeal." *Klair v. Reese,* 531 A.2d 219, 222 (Del.1987) ... When there is uncertainty in the meaning and application of the terms of the contract, the trial court will consider testimony pertaining to antecedent agreements, communications, and other factors which bear on the proper interpretation of the contract. *Klair v. Reese,* 531 A.2d at 223. "However, if the instrument is clear and unambiguous on its face, the trial court may not consider parol evidence 'to interpret it or search for the parties' intent[ions] ...'" *Pellaton v. Bank of New York,* 592 A.2d 473, 478 (Del.1991) (additional citations omitted).

■ 6. If terms used in a contract are not given technical definitions within the four corners of the contract, the common meanings of those terms as used in ordi-

nary English must govern the application of the contract. *See James v. Getty Oil Co.*, 472 A.2d 33, 39 (Del.Super.Ct.1983).

7. A contractual provision "is not made ambiguous merely because the parties disagree on its proper construction." *Hibbert v. Hollywood Park, Inc.*, 457 A.2d 339, 343 (Del.1983).

*Acquisition of "All or Substantially All" Assets*

8. The phrase "all or substantially all" as used in Article VII, section 2 of the License Agreement is not ambiguous.

9. The phrase "all or substantially all," when used in the context of a sale of assets of a Delaware corporation, has had a clear, generally accepted meaning under Delaware law since before 1977 when the License Agreement was entered into. *See e.g. Gimbel v. Signal Companies, Inc.*, 316 A.2d 599 (Del.Ch.1974), *aff'd*, 316 A.2d 619 (Del.1974); *B.S.F. Co. v. Philadelphia Nat'l Bank*, 42 Del.Ch. 106, 204 A.2d 746 (1964).

10. Existing laws become part of a contract. *Koval v. Peoples*, 431 A.2d 1284, 1285 (Del.Super.1981). "The rule is well established that the laws in force at the time and place of making the contract enter into, and form a part of it as if they had been expressly referred to, or incorporated in, its terms." *Id.*

11. A company sells "all or substantially all" of its assets when "the sale is of assets quantitatively vital to the operation of the corporation and is out of the ordinary and substantially affects the existence and purpose of the corporation." *Gimbel*, 316 A.2d at 606.

12. In determining whether a corporation has sold the assets quantitatively vital to its existence and purpose (i.e. whether the sale is "out of the ordinary and substantially affects the existence and purpose of the corporation"), the Court must focus on the nature of the corporation and the effect of the transaction on its ability to carry out its purpose after the time of the transaction. *See Gimbel*, 316 A.2d at 606, 608. Furthermore, the Court must consider the value of all assets of the corporation

and their relative importance to the corporation's principal business operations. *See Id.* at 606–08; *see also Katz v. Bregman*, 431 A.2d 1274, 1276 (Del.Ch.1981), *appeal ref'd sub nom. Plant Indus. v. Katz*, 435 A.2d 1044 (Del.1981) (sale of assets used in corporation's "principal business" constituted sale of "all or substantially all" of its assets). *See e.g., Philadelphia Nat'l Bank*, 204 A.2d at 749 (sale of assets comprising 47.4% of total book value and 75% of total actual value was sale of all or substantially all assets); *Katz v. Bregman*, 431 A.2d 1274, 1276 (Del.Ch.1981) (sale of assets comprising 51% of corporation's assets was sale of all or substantially all assets).

13. Mostek's 1985 sale of its assets to ST: (1) was a sale of assets quantitatively vital to the operation of Mostek; (2) was out of the ordinary course of Mostek's business; and, (3) substantially affected Mostek's existence and corporate purpose.

14. ST acquired substantially all of Mostek's assets. Assuming *arguendo* that HSDS and the Colorado Springs fabrication facility were treated as retained assets of UTC, ST would still have acquired substantially all of Mostek's assets.

15. The Mostek–Intel Licensing Agreement has been validly assigned to ST, granting ST a license from Intel "to make ..., to sell (either directly or indirectly), ... and to otherwise dispose of" any products covered by Intel patents applied for prior to the expiration or termination of the License Agreement. Such manufacture, use, or sale by ST of any product, including but not limited to the FasMath coprocessor, if covered by an Intel patent, would be authorized by the License Agreement as a "Licensed Product."

16. The License Agreement is a valid and binding agreement between ST and Intel, enforceable in accordance with its own terms. It authorizes ST to manufacture and sell any product covered by Intel's patents, including the FasMath coprocessor to third parties such as Cyrix.

**1212**

*Ratification*

■ 17. Under Delaware law, a party ratifies a transaction if, with actual or imputed knowledge of material facts, the party does anything amounting to a recognition of the transaction or acts in a way that "reasonably warrant[s] the conclusion that he has accepted or adopted it." *Papaioanu v. Commissioners of Rehoboth,* 40 Del.Ch. 557, 186 A.2d 745, 750 (1962) (quoting *Frank v. Wilson & Co.,* 27 Del. Ch. 292, 32 A.2d 277, 283 (1943)).

■ 18. Ratification can occur when a party who executes a contract "accepts the benefits flowing from it or remains silent or acquiesces in the contract for any considerable length of time after the party has the opportunity to annul or avoid the contract." *Graham v. State Farm Mut. Auto Ins. Co.,* 1989 W.L. 12233, at *2 (Del.Super.Ct. Jan 26, 1989), *aff'd,* 565 A.2d 908 (Del.1989).

■ 19. Intel is barred from challenging the validity and effectiveness of Mostek's assignment to ST of its contractual interests in the License Agreement because Intel ratified the assignment by continuing to accept the benefits of the assignment.

*Waiver*

■ 20. "A waiver ... is the intentional relinquishment of a known right." *Board of Public Educ. v. Delaney,* 52 Del. 213, 155 A.2d 51, 54 (1959); *see George v. Frank A. Robino, Inc.,* 334 A.2d 223, 224 (Del.1975).

21. Intel is barred from challenging the validity and effectiveness of Mostek's assignment to ST of its contractual interests in the License Agreement because Intel waived such claims by acquiescing in the assignment with knowledge that it had occurred in connection with a sale of less than all of Mostek's assets and by continuing to accept and exercise all rights and benefits conferred upon it by the License Agreement.

*Equitable Estoppel*

■ 22. The doctrine of equitable estoppel applies "when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment." *Waggoner v. Laster,* 581 A.2d 1127, 1136 (Del.1990) (quoting *Wilson v. American Ins. Co.,* 58 Del. 394, 209 A.2d 902, 903–04 (1965)); *see Wolf v. Globe Liquor Co.,* 34 Del.Ch. 312, 103 A.2d 774, 776 (1954) (finding equitable estoppel particularly applicable if parties have long acquiesced in mutual dealings).

■ 23. Under the doctrine of equitable estoppel, a party may not impeach a transaction if (1) affirmative conduct from him has led a second party to rely on the validity of the transaction, and (2) the second party would be materially harmed if the first party were allowed to assert a claim inconsistent with that conduct. *See Thomas v. Delaware Adolescent Program, Inc., No. 684,* 1984 WL 8229, at *4 (Del.Ch. Mar. 30, 1984).

24. By knowingly and intentionally acquiescing in the assignment for more than five (5) years, Intel induced ST to rely and act upon its representation that the assignment by Mostek was valid and binding upon Intel.

25. Intel is estopped from challenging the validity and effectiveness of Mostek's assignment to ST of its contractual interests in the License Agreement because it induced ST to rely to ST's detriment upon its representations, by its conduct and otherwise, that the assignment by Mostek was valid and binding upon Intel.

*Laches*

■ 26. The doctrine of laches will bar a claim if (1) a party has unreasonably delayed asserting the claim, and (2) another party has suffered material prejudice or injury as a result of the delay. *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.,* 944 F.2d 870, 876 (Fed.Cir. 1991); *see Hartman v. Buckson,* 467 A.2d 694, 697 (Del.Ch.1983).

27. "Sitting by inactive and in what amounts to silence, when every consideration for the rights of others demand[s] prompt and vigorous action, and until affairs ... become so complicated that a restoration of former status [is] difficult, if not impossible, is conduct amounting to

laches." *Shanik v. White Sewing Machine Corp.*, 25 Del.Ch. 371, 19 A.2d 831, 837 (1941) (quoting *Federal United Corp. v. Havender*, 24 Del.Ch. 318, 11 A.2d 331, 343 (1940)).

28. Intel is barred by laches from challenging the validity and effectiveness of Mostek's assignment to ST of Mostek's contractual interests in the License Agreement because Intel unreasonably delayed the presentation of its claims until more than five years after it was notified of the assignment, during which period it represented to ST that the assignment was valid as to ST and induced ST to alter its position accordingly in a manner that will result in material prejudice or·injury as a result of the delay.

*Intel's Defenses to ST's Equitable Claims*

29. A party has no basis for challenging·claims for equitable relief based on another party's alleged negligent or careless misrepresentation unless, because of the nature of the relationship between the parties one party has the right to rely on the other for information, and the other owes a duty to give it with care. *Employers' Liability Assurance Corp. v. Madric*, 54 Del. 146, 174 A.2d 809, 812–13 (Del.Super.1961), *rev'd on other grounds*, 54 Del. 593, 183 A.2d 182 (1962).

30. A defendant's duty to disclose material facts may arise from a fiduciary relationship. *Chiarella v. U.S.*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980); *Everman Nat'l Bank v. U.S.*, 756 F.2d 865, 869 (Fed.Cir.1985). But in an arms'-length transaction, such as the one between Mostek (ST) and Intel, no such duty arises. *Everman Nat'l Bank*, 756 F.2d at 868; *New Castle Boat Co. v. Gambacorta*, 38 Del.Ch. 600, 157 A.2d 582, 585 (1960).

31. Intel has no basis for challenging ST's equitable claims based on alleged misrepresentations of fact by ST or on ST's alleged failure to disclose information.

*The Patent Exhaustion Doctrine and License Agreements*

32. A patent owner's monopoly ends with the first sale or disposition by a patentee, or his licensee acting within the scope of the license, of an article embodying the invention of the patent. *U.S. v. Univis Lens Co.*, 316 U.S. 241, 250, 62 S.Ct. 1088, 1093, 86 L.Ed. 1408 (1942):

The patentee may surrender his monopoly in whole by the

sale of his patent or in part *by the sale of an article embodying the invention.* His monopoly remains so long as he retains the ownership of the patented article. But sale of it exhausts the monopoly *in that article* and the patentee may not thereafter, by virtue of his patent, control the use or disposition *of the article. Bloomer v. McQuewan*, 14 How. [55 U.S.] 539, 549–50 [14 L.Ed. 532]; *Adams v. Burke*, 17 Wall. [84 U.S.] 453 [21 L.Ed. 700]; *Hobbie v. Jennison*, 149 U.S. 355 [13 S.Ct. 879, 37 L.Ed. 766]. (emphasis added)

33. Patent exhaustion is a fundamental doctrine of patent law first enunciated by the Supreme Court nearly 120 years ago. *Adams v. Burke*, 84 U.S. (17 Wall.) 453, 21 L.Ed. 700 (1873):

[I]n the essential nature of things, when the patentee, or the person having his rights, sells a machine or instrument whose sole value is in its use, he receives the consideration for its use and he parts· with the right to restrict that use. *The article, in the language of the court, passes without the limit of the monopoly.* That is to say, the patentee or his assignee having in the act of sale received all the royalty or consideration which he claims for the use of his invention in that particular machine or instrument, it is open to·the use of the purchaser without further restriction on account of the monopoly of the patentees. (emphasis added) (citations omitted)

34. The Court of Appeals for the Federal Circuit has consistently applied the Patent Exhaustion Doctrine in a variety of contexts, including situations involving foundry relationships in which a foundry manufactures products to a customer's design. In *Intel Corp. v. U.S. Intern. Comm'n*, 946 F.2d 821, 826 (Fed.Cir.1991), the Federal Circuit stated that if such a

license agreement permits foundry manufacture of customer-designed circuits, then the purchaser would be free to "use and/or resell" the products:

> If the Intel/Sanyo agreement permits Sanyo to act as a foundry for another company for products covered by the Intel patents, the purchaser of *those licensed products* from Sanyo would be free to use and/or resell *the products.* Such further use and sale is beyond the reach of the patent statutes. *See U.S. v. Univis Lens Co.,* 316 U.S. 241, 250–52 [62 S.Ct. 1088, 1093–94, 86 L.Ed. 1408] (1942) (the first vending of any article manufactured under a patent puts the article beyond the reach of the patent). (emphasis added).

■ 35. An authorized sale of a patented product exhausts the patent monopoly as to that product. Thus, a purchaser of such a product from a patent owner may use or resell the product free of control or conditions imposed by the patent owner. *See U.S. v. Univis Lens Co.,* 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942); *Adams v. Burke,* 84 U.S. (17 Wall) 453, 21 L.Ed. 700 (1873).

■ 36. The Patent Exhaustion Doctrine applies as well to the disposition of a product under a license as it does to outright sale. *See generally U.S. v. Masonite Corp.,* 316 U.S. 265, 276, 62 S.Ct. 1070, 1077, 86 L.Ed. 1461 (1942) ("[T]his Court has quite consistently refused to allow the form into which the parties chose to cast the transaction to govern. The test has been whether or not there has been such a disposition of the article that it may fairly be said that the patentee has received his reward for the use of the article.").

37. The Court in *Harshberger v. Tarrson,* 87 F.Supp. 43, 45–46 (N.D.Ill.1949), *aff'd* 184 F.2d 628 (7th Cir.1950) also recognized that a conventional sale is not required to trigger patent exhaustion. In *Harshberger,* a patent license granted the right to make, use and sell a product (razors) covered by the licensed patent. The Court ruled that the patent owner's monopoly ended once the product was made by the licensee and "disposed of" to a third-

party, even though it was transferred as the result of a security pledge rather than by a sale.

■ 38. An authorized sale of the patented invention by a licensee to a third party places any resale by the third party beyond the reach of the infringement statute by reason of the third party's "authority to resell the product" derived from the licensee. *Unidisco, Inc. v. Schattner,* 824 F.2d 965, 968 (Fed.Cir.1987), *cert. denied,* 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988). Furthermore, resale following an authorized sale by a licensee does not create a sublicense. *Lisle Corp v. Edwards,* 777 F.2d 693, 695 (Fed.Cir.1985).

■ 39. The ST–Cyrix relationship constitutes the sale of a product and not a bailment. In order for there to be a bailment, the identical goods must have been in existence at the time the bailment occurred. In distinguishing bailments from sales, the test is whether the identical thing is returned, in the same or in some altered form. If another thing of equal value is returned, the transaction is a sale. *Guidry v. Continental Oil Co.,* 350 F.2d 342, 345 & n. 10 (5th Cir.1965) (quoting *Black's Law Dictionary* 185 (3d. ed. 1933)).

40. The transaction between ST and Cyrix is a vehicle for the transfer of ownership from ST to Cyrix of the FasMath coprocessors, including all of their components.

■ 41. It is irrelevant to the application of the patent exhaustion doctrine that an article was designed by another party. The issue—as plainly stated in *Univis Lens Co.,* its progenitors, and progeny—is whether the article is a physical embodiment of the patented invention.

42. The express terms of the Intel–Mostek Agreement are consistent with Patent Exhaustion Doctrine. Intel granted a license "to make, to have made, to use, to sell (either directly or indirectly), to lease and to otherwise dispose of 'Licensed Products.'" Thus, by operation of law and contract, any disposition of a Licensed Product by a licensee under the Intel–Mostek Agreement—by sale or otherwise—ex-

hausts Intel's patent rights with respect to that article.

43. ST is licensed to make, use and sell products embodying Intel's intellectual property. Therefore, the FasMath coprocessors are "Licensed Products" under the Intel–Mostek Agreement. Cyrix, as the purchaser of "Licensed Products" from ST is "free to use and/or resell the products. Such further use and sale is beyond the reach of the patent statutes." *Intel Corp. v. U.S. Intern. Trade Comm'n,* 946 F.2d 821, 826 (Fed.Cir.1991).

Intervenor ST shall submit a proposed form of judgment consistent with these Findings of Fact and Conclusions of Law on or before twenty (20) days from the date thereof.

It is so ORDERED.